**UNITED STATES GYPSUM COMPANY, Plaintiff,**

v.

**PACIFIC AWARD METALS, INC., Defendant.**

No. C 04–04941 JSW.

United States District Court, N.D. California.

June 12, 2006.

David Leon Bilsker, Howrey Simon Arnold & White, San Francisco, CA, Michael M. Geoffrey, Chief Intellectual Property Counsel USG Corporation, Michael P. Padden, Thomas W. Jenkins, Howrey Simon Arnold & White, Chicago, IL, for Plaintiff.

Amanda Fox, Perkins Coie LLP, Menlo Park, CA, David Leon Bilsker, Howrey Simon Arnold & White, San Francisco, CA, for Defendant.

## ORDER GRANTING UNITED STATES GYPSUM COMPANY'S MOTION FOR SUMMARY JUDGMENT RE NON–INFRINGEMENT

WHITE, District Judge.

### INTRODUCTION

This matter comes before the Court upon consideration of the motion for summary judgment filed by Plaintiff United States Gypsum Company ("USG"). Having considered the parties' pleadings, rele-

vant legal authority, and having had the benefit of oral argument, the Court HEREBY GRANTS USG's motion.

In its motion, USG argues that it is entitled to judgment as a matter of law on the false marking counterclaim filed by Defendant Pacific Award Metals, Inc. ("Award") with respect to U.S. Patent No. 5,131,198 (the "'198 Patent"), which relates to corner beads for drywall construction and particularly to corner beads having an outer paper layer.[1]

### BACKGROUND

#### A. Procedural Background.

On November 19, 2004, USG filed this infringement action alleging that Award infringed the '198 Patent. On December 20, 2004, Award answered and filed a counterclaim for, *inter alia,* false marking. In its counterclaim, Award alleged that USG falsely marked its products with the '198 Patent when USG "knew the protective coating on its paper-faced corner bead products has a thickness that, as measured from the surface of the paper to the top of the protective coating, is substantially less than 0.001 inches." (Declaration of Thomas W. Jenkins ("Jenkins Decl."), Ex. 10 at p. 11, ¶ 21.)

On November 2, 2005, the Court held a hearing to construe the two disputed claim terms of the '198 Patent. At that hearing, Award contended that the thickness of the protective coating should exclude any protective coating that penetrated the surface of the front paper layer. USG argued to the contrary and claimed that the thickness of the protective coating should include protective coating that penetrated the surface of the front paper layer.

On November 8, 2005, the Court issued its Claim Construction Order, in which it

---

1. Award has stated that it will withdraw its counterclaim for unfair competition. Pursuant to that representation, Award is directed to file a dismissal of that counterclaim within five days of the date of this Order.

rejected USG's proposed construction of the thickness limitation. The Court construed the disputed term to mean: "The protective coating penetrates some of the fibers at the surface of the front paper layer and measures about 0.001 inches to 0.005 inches in thickness on the front surface of said front paper layer, said thickness excluding penetration depth of said protective coating." (Claim Construction Order at 9:10–13.)

USG conceded that, under the Court's construction, Award's products did not literally infringe the '198 Patent but maintained that Award's products infringed under the Doctrine of Equivalents. USG also continued to mark its paper-faced corner bead products with the '198 Patent. (Declaration of Val Perrine ("Perrine Decl."), ¶ 13; Jenkins Decl., Ex. 5 (Perrine Depo. at 591:24–592:18).)

On March 1, 2006, the Court granted Award's motion for summary judgment and found that the doctrine of prosecution history estoppel precluded USG from claiming infringement by equivalence. Following that Order, USG stopped marking its nose coated paper-faced corner bead products with the '198 Patent. (Perrine Decl., ¶ 13.)

### B. Factual Background.

The following facts are undisputed. The '198 Patent was issued on July 21, 1992 to inventors James Ritchie and Don King and was assigned to their employer BeadeX. (Jenkins Decl., Ex. 1.) After the '198 Patent issued, BeadeX began to mark its nose coated paper-faced corner bead products

with the '198 Patent. (Jenkins Decl., Ex. 2 (Ritchie Depo at 27:21–28:1).) At some point thereafter, BeadeX began to outsource the coating process and discovered that the protective coating applied by its vendor to the nose coated paper-faced corner bead products measured less than 0.001 inches above the surface of the paper. (Declaration of Craig Radford ("Radford Decl."), ¶ 3; Declaration of Wesley Dunham ("Dunham Decl."), ¶ 7.) [2] Notwithstanding this discovery, BeadeX continued to mark these products with the '198 Patent.

In approximately 1994, USG entered into a relationship with BeadeX whereby BeadeX supplied USG with nose coated paper-faced corner beads to be sold under USG's private labels. Those products were marked with the '198 Patent. (Perrine Decl., ¶ 4–7; Jenkins Decl., Ex. 5 (Perrine Depo. at 232:6–12, 232:20–233:4).) USG eventually acquired BeadeX for approximately $75 million. After the acquisition, USG continued to place the '198 Patent on its nose coated paper-faced corner bead products and, as noted above, continued to do so until after the Court granted summary judgment in favor of Award on the Doctrine of Equivalents issue. The Court addresses additional facts in its analysis.

### ANALYSIS

#### A. Legal Standards Applicable to Summary Judgment.

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24,

---

**2.** Mr. Radford was the operations manager at BeadeX and then at USG from 1993 through 2000. (Radford Decl., ¶ 1.) Mr. Radford was Mr. Dunham's supervisor.

Mr. Dunham worked at BeadeX and USG from April 1969 through August 2003. (Jenkins Decl., Ex. 4 (Dunham Depo. V. 1 at 9:12–

10:11.).) From 1985 through 1995, Mr. Dunham was the Supervisor of Maintenance and Production for the BeadeX nose coated paper-faced corner bead products. (Dunham Decl., ¶ 2.) Thereafter, Mr. Dunham was a Technical Manager for new product development at BeadeX and then at USG. (*Id.*)

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(C). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248, 106 S.Ct. 2505.

If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party either must produce evidence that negates an essential element of the non-moving party's claims or must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir.2000). Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, "set

forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996). If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

**B. Legal Standards for False Marking.**

 Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented for the purpose of deceiving the public; ... [s]hall be fined not more than $500 for every such offense.

35 U.S.C. § 292(a).[3] In order to prevail on its false marking counterclaim, Award must demonstrate by a preponderance of the evidence that USG (1) used a mark "importing that an object is patented (2) falsely affixed to (3) an unpatented article (4) with the intent to deceive the public." *Clontech Labs., Inc. v. Invitrogen Corp.,* 406 F.3d 1347, 1351 (Fed.Cir.2005); *accord Mayview Corp. v. Rodstein,* 620 F.2d 1347, 1359–60 (9th Cir.1980).

 The first step in a false marking analysis is to determine whether an article is unpatented, *i.e.,* that the article is "not covered by at least one claim of each patent with which [it] is marked." *Clontech,* 406 F.3d at 1352. To do that, "the claim in question must be interpreted to ascertain its correct scope, and then it must be ascertained if the claim reads on the article in question." *Id.*[4]

---

**3.** Section 292 is penal in nature and, therefore, must be strictly construed. *Mayview Corp. v. Rodstein,* 620 F.2d 1347, 1359 (9th Cir.1980)

**4.** The district court in *Clontech* concluded that the doctrine of equivalents could not be applied to determine if an article was "patented." *See Clontech Labs., Inc. v. Invitrogen*

■ "Intent to deceive is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so," *i.e.*, that an article so marked is in fact patented, "and consequently that the recipient of its saying will be misled into thinking that the statement is true." *Clontech Labs., Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1352 (Fed.Cir.2005). "Intent to deceive ... is established in law by objective criteria." *Id.* Thus, " 'the *fact* of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent.' " *Id.* (quoting *Norton v. Curtiss*, 57 C.C.P.A. 1384, 433 F.2d 779, 795–96 (Cust. & Pat.App.1970)) (emphasis in original). That is to say, if a party states that an article marked with a patent is covered by the patent when it knows it is not, one can infer that an intent to deceive existed.

■ However, to show the requisite knowledge of falsity a plaintiff in a false marking case "must show by a preponderance of the evidence that [the defendant] did not have a reasonable belief that the articles were properly marked (*i.e.* covered by a patent). Absent such proof of lack of reasonable belief, no liability under the statute ensues." *Id* at 1352–53. Normally, the question of whether "conduct rises to the level of statutory deception is a question of fact." *Id.* at 1353.

## C. Evidentiary Rulings

■ USG moves to strike certain paragraphs of the Declaration of Andrew Shores, submitted by Award in opposition to USG's motion. USG contends that the opinions set forth in the Shores declaration were not timely disclosed in his initial expert report and, accordingly, should not be considered. The Shores declaration is offered by Award to show that USG's belief that its products were covered by the '198 Patent was unreasonable because if USG had conducted an investigation using any of the methods described by Dr. Shores, USG would have known the products were not covered by the '198 Patent, even under the construction USG proposed. Award also contends, in opposing the motion to strike, that the report was submitted to counter a rebuttal report from USG's expert, Mr. Klass. However, USG did not rely on Mr. Klass' opinions in moving for summary judgment on this issue.

Since it filed its false marking claim, Award has known that it would bear the burden of establishing that USG intended to deceive the public and, thus, knew its products were not covered by the '198 Patent. Moreover, Award has known since the parties began briefing the issue of claim construction, that USG contended that the thickness limitation should be measured to include protective coating that penetrated the surface of the front paper layer. Award also has known since that time that USG contended that the purpose of the protective coating was to prevent surface abrasion. In light of these facts, Award's claims of surprise and its contentions regarding USG's purportedly belated disclosure of a "reasonable mistake" defense ring hollow.

The opinions set forth in the Shores declaration bear directly on issues for which Award bears the burden of proof in

*Corp.*, 263 F.Supp.2d 780, 792 (D.Del.2003). The Federal Circuit's opinion does not expressly address this issue. Because the parties in this case do not dispute the "unpatented" element, the Court presumes for purposes of this motion that Award has established the second and third elements. The Court notes, however, that, in the instant case, USG essentially takes the position that the products in question are substantially covered or equivalently covered in making its functionality argument. These facts distinguish this case from *Clontech*. The Court addresses the import of this position in resolving the issue of whether there is evidence of an intent to deceive the public.

its affirmative claim for relief against USG. Award has not provided the Court with a substantial justification for failing to disclose these opinions in Shores' initial expert report. Accordingly, the Court finds USG's objections well taken and shall not consider the Shores declaration in deciding this motion.

■■■ Award also seeks to introduce testimony from Charles Klass that it contends it was unable to submit with its opposition because of deposition scheduling. USG opposes this request and asserts that Award created the delay by not agreeing to conduct the deposition earlier. Because USG's only basis for objection to this testimony is the scheduling issue, and because USG has submitted additional testimony from Mr. Klass directed to the testimony offered by Award and has presented argument on the points raised by Award in submitting the testimony, the Court GRANTS Award's request to submit the late testimony and shall consider both parties' submissions.

**D. USG Is Entitled to Summary Judgment on Award's False Marking Claim.**

It is undisputed that as of approximately 1993, the protective coating on USG's nose coated paper-faced corner bead products measured less than 0.001 inches above the surface of the paper. The parties dispute whether USG intended to deceive the public when, despite its knowledge of this fact, it continued to mark the products in question with the '198 until March 1, 2006. Although Award's claims of false marking relate to USG, what BeadeX knew and did is relevant to this dispute to the extent USG later relied on representations from BeadeX.

There are obvious disputes between the parties about who at BeadeX told what to whom and when, with respect to whether or not the products should be marked.

For example, Mr. Dunham claims he told senior management at BeadeX that he believed the products did not fall within the '198 Patent, although he was unsure if he ever communicated his views to Mr. Ritchie or Mr. King, the named inventors on the '198 Patent. (Jenkins Decl, Ex. 4 (Dunham Depo. V. 1 at 46:4–47:4, 48:16–25).) Mr. Radford denies Mr. Dunham made that claim. (*Compare* Dunham Decl., ¶ 9 *with* Radford Decl., ¶ 4.) The Court does not find these disputes to be material in light of the undisputed fact that, as properly construed by this Court, the nose coated paper-faced bead products did not fall within the literal claims of the '198 Patent as of approximately 1993. What is material to the resolution of *this* motion, is *why* and *on what basis* USG formed its belief that the patents were marked properly with the '198 Patent notwithstanding the fact that the protective coating above the surface was less than 0.001 inches. That essentially calls for an inquiry into the reasonableness of USG's belief of its proposed claim construction.

■■■ To meet its burden on summary judgment, USG proffers testimony from Mr. Radford who attests that, after BeadeX learned that the protective coating measured less than 0.001 inches above the surface of the paper, members of the BeadeX Defect Reduction Committee discussed the issue. Mr. Radford states this committee reviewed the '198 Patent and read it to call for a penetrating protective coating. According to Mr. Radford, because it appeared that the thickness of the protective coating, including penetration depth, fell within the range identified in the '198 Patent, the committee concluded that the products continued to read on the claims of the '198 patent. (Radford Decl., ¶ 3; Jenkins Decl., Ex. 3 (Radford Depo. at 34:22–35:8).)

Mr. Radford also attests that "based on visual observation and the performance of

the product, we estimated a coating penetration depth of about 3–4 mils, about halfway through the paper," which in his understanding met the claims of the '198 Patent. (Radford Decl., ¶ 3.) USG also presents evidence that the specifications BeadeX provided to outside vendors, directed to the thickness of the coating, did not contain a specification relating to the thickness of the coating over and above the top surface of the paper. (*See* Jenkins Decl., Ex. 4 (Dunham Depo. V. 1 at 139:24–143:15).) But USG also introduces evidence from Mr. Dunham, a member of this committee, in which he claims "all the members of the BeadeX team, including Mr. Ritchie, understood our invention to require a layer of protective material that exceeded the paper's thickness by about 0.001 to 0.005" inches. (Jenkins Decl., Ex. 16 at ¶ 10.) There is no evidence in the record that Mr. Ritchie's opinion on this issue was communicated to anyone at USG.

Mr. Perrine, USG's current director of Marking and Finishing Systems, testified that when USG and BeadeX entered into the private label distribution relationship, he was advised by Mr. Ritchie and other members of BeadeX management that the products were "patented under" the '198 Patent. (Perrine Decl., ¶¶ 1–2; Jenkins Decl., Ex. 5 (Perrine Depo. at 46:18–47:7).) Mr. Perrine also attests that during this relationship, BeadeX continued to mark the products with the '198 Patent, that USG relied on BeadeX for the factual details to be included on the USG private labels, and that no one at BeadeX suggested that there was any reason the '198 Patent should not be on the labels. (*See, e.g.,* Perrine Decl., ¶¶ 3–4; Jenkins Decl., Ex. 5 (Perrine Depo. at 52:9–53:25).)

Mr. Perrine's testimony as to what he was told by BeadeX is supported by Mr. Ritchie's testimony that he "was under the assumption at the time [that USG and BeadeX were contemplating a business relationship] that [the products were] within this portion of the patent," and that he was confident that he communicated to Mr. Perrine that the product was patented. (Jenkins Decl., Ex. 2 (Ritchie Depo. at 29:19–30:14).) Mr. Ritchie also testified that he never told anyone at USG that the products did not practice the patent because he did not know "it had fallen outside the patent until very recently when Award explained to him how the thickness of the coating fell outside of the—of this patent." (*Id.* at 33:15–21.) USG also provides testimony from Mr. Dunham that because Mr. Ritchie knew more about the '198 Patent than he did, Mr. Dunham would rely on Mr. Ritchie's opinion as to what was covered by the patent. (Jenkins Decl., Ex. 6 (Dunham Depo. V. 4 at 103:7–25).)

USG also asserts that when it acquired BeadeX, it conducted an independent evaluation of whether the nose coated paper-faced corner bead products were covered by the '198 Patent. According to the record, the independent evaluation consisted of Mr. Perrine's reliance on what he was told by Mr. Ritchie and others at BeadeX, namely that the products were covered by the '198 Patent. (*See, e.g.,* Perrine Decl., ¶ 5; Jenkins Decl., Ex. 5 (Perrine Depo. at 310:14–17).) The evaluation did not consist of any formal analysis of the thickness of the protective coating material. (Jenkins Decl., Ex. 5 (Perrine Depo. at 312:1–313:3, 316:5–15, 317:2–9).) Rather, in addition to what he had been told by Mr. Ritchie and others at BeadeX, Mr. Perrine relied on his 27 years of experience in the building industry and his experience with coating on drywall paper. (Perrine Decl., ¶ 6; Jenkins Decl., Ex. 5 (Perrine Depo. at 315:5–316:4).) Based on that experience, and knowing that the patent called for penetrating coating and some "visual observation", Mr. Perrine "believed that the

total coating thickness on the BeadeX products was at least 1–3 mils." (Perrine Decl., ¶ 6; *see also* Jenkins Decl., Ex. 5 (Perrine Depo. at 316:15–317:1, 317:10–318:22).) USG also relies on the fact that it acquired BeadeX for approximately $75 million to negate an intent to deceive the public, asserting it would have been unreasonable to pay that much for a company if the products in question did not have patent protection. (Perrine Decl., ¶ 7.)

Finally, in approximately August 2004, before this case was filed and well before the Court construed the claims of the '198 Patent, USG proffers evidence that it reviewed scanning electron photomicrographs ("SEMs") of cross-sections of its nose coated paper-faced corner bead products. (Perrine Decl., ¶ 12 and Ex. 1.) According to Mr. Perrine he was advised by the person who conducted the analysis that those SEMs show that the protective coating had a total thickness, including penetration depth, of approximately 0.002 inches, which is also supported by evidence put forth by Award. (*Id.; see also* Jenkins Decl., Ex. 5) (Perrine Depo. at 114:1–115:21; 118:25–119:8; 334:2–15); Declaration of Nicole S. Cunningham ("Cunningham Decl."), · Ex. D (Perrine Depo. at 121:14–123:19.) Because, as USG interpreted the '198 Patent, this thickness fell within the scope of the claims, USG continued to mark its paper-faced corner bead products with the '198 Patent. (Perrine Decl., ¶ 12.)

In an effort to rebut USG's contentions that it reasonably believed the products to be covered by the '198 Patent, Award suggests that Mr. Perrine is not a person of ordinary skill in the relevant art, so that · his beliefs cannot establish a reasonable belief that the products were covered by the Patent. (Cunningham Decl., Ex. C (Klass Depo. at 32:23–34:15), Ex. D (Perrine Depo. at 130:18–137:3).) Award also proffers the testimony of Mr. Klass, who testified he would not rely solely on a visual observation to determine the thickness of the coating. (5/12/06 Klass Depo. at 105:2–22.) [5]

Award also proffers the declarations of Mr. Dunham and Mr. Walker, who were members of Defect Reduction Committee and who deny that the committee discussed whether the products still were covered by the '198 Patent. They also deny the conclusions Mr. Radford claims the committee reached. (*See* Dunham Decl., ¶¶ 16–19; Declaration of Rick Walker ("Walker Decl."), ¶ 6.) Mr. Dunham attests that he was under the impression that Mr. Radford agreed with his opinion that the products were not covered, but that he awaited further direction from Mr. Radford. (Dunham Decl., ¶ 9.) Mr. Dunham also testified that he "just voiced [his] opinion to [senior management] and expected they would know what to do with it," but conceded that Mr. Ritchie as president of the company would be responsible for decisions made and that he, Mr. Dunham, would rely on Mr. Ritchie's opinion as to whether the products should be marked with the '198 Patent. (Jenkins Decl., Ex. 6 (Dunham Depo. V. 4 at 102:1–103:25).)

Mr. Dunham also declares that after he expressed his opinions, he was advised by Mr. Radford that BeadeX did not want to spend the money associated with obtaining a new patent and would take the position that the thinner coatings were covered. Mr. Dunham claims that he advised Mr. Radford this was an untenable position. (*See* Dunham Decl., ¶¶ 10–14.) [6]

---

**5.** Attached to the Declaration of Colbern Stuart in Support of Award's Motion for Administrative Relief for Leave to Submit Recent Deposition Testimony.

**6.** The Court notes that this is the only evidence that Award proffers that suggests USG had · an improper motive in continuing to mark its products with the '198 Patent. The

Award also tries to show USG's belief was unreasonable by proffering evidence to show that Mr. Ritchie believed "we needed a minimum of 0.001 of an inch to provide necessary water and sanding resistance." (Cunningham Decl., Ex. A ("Ritchie Depo. at 84:4–13"); *see also id.* (Ritchie Depo. at 39:18–40:9, 43:3–16, 45:3–14, 83:9–18, 84:4–13 (discussing his belief that a minimum layer of coating above the surface was required).) Mr. Ritchie also testified, however, the fact that Award had determined BeadeX was outside the patent came as a surprise to him. (*Id.* at 55:15–19).)

Award also puts forth evidence that, with respect to another aspect of the '198 Patent, Mr. Perrine acted "conservatively" and removed that patent number from some products that he believed could be read to not fall within the scope of that aspect of the '198 Patent. (Cunningham Decl., Ex. D) (Perrine Depo. at 325:12–326:16.) Award argues that this conservative view belies the reasonableness of USG's view with respect to the thickness limitation. Finally, with respect to USG's argument that it would not have acquired BeadeX for $75 million if its products had not been patented, Award proffers Mr. Ritchie's testimony that, at the time USG acquired BeadeX, he believed the value of the '198 Patent had diminished. (Cunningham Decl., Ex. A (Ritchie Depo. at 34:10–14).)

Award also argues that after the Court construed the '198 Patent in November 2005, USG's decision to continue to mark the products with the '198 Patent was improper. Award contends that USG's argument that the products functioned in substantially the same way, notwithstanding what it contends is an insubstantial difference with respect to the thickness

rest of the evidence presented speaks to the reasonableness of USG's construction of the

limitation, they would fall within the claims of the '198 Patent. Although the thickness limitation is the focus of the instant motion, the Court also construed protective coating to mean: "The material applied to the front paper layer to reinforce said front paper layer and to provide surface protection against abrasion." (Claim Construction Order at 7:17–18.) Award does not put forth any evidence to suggest that a function of the protective coating taught by the '198 Patent is not to provide surface protection against abrasion.

Considering all of these facts and the reasonable inferences therefrom in the light most favorable to Award, as it must, the Court concludes that these facts simply do not give rise to a disputed issue of fact as to whether between 1993 and March 1, 2006, USG intended to deceive the public when it marked its nose coated paper-faced corner bead products with the '198 Patent. Accordingly, the Court concludes that USG is entitled to judgment in its favor on the false marking claim.

## CONCLUSION

For the foregoing reasons, USG's motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**